**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| TAYLOR ENERGY COMPANY LLC, |
| Plaintiff, |
| v. |
| UNITED STATES DEPARTMENT OF THE INTERIOR, BUREAU OF OCEAN ENERGY MANAGEMENT; BUREAU OF SAFETY AND ENVIRONMENTAL ENFORCEMENT; UNITED STATE DEPARTMENT OF HOMELAND SECURITY; and UNITED STATES COAST GUARD, |
| Defendants. |

Civil Action. No 16-CV-388 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff, Taylor Energy Company, LLC, a Louisiana limited liability company that has been engaged in the exploration, development, and production of oil and gas in the Gulf of Mexico, Compl. ¶ 4, ECF No. 1, initiated this action against the United States Department of the Interior ("DOI"), DOI's components, the Bureau of Ocean Energy Management ("BOEM") and Bureau of Safety and Environmental Enforcement ("BSEE"), the Department of Homeland Security ("DHS"), and DHS's component, the United States Coast Guard ("USCG"), pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. The plaintiff challenges the defendants' responses to a FOIA request seeking records that formed the basis for statements posted on BSEE's website concerning the plaintiff's response to an incident on the plaintiff's former oil platform in the Gulf of Mexico, about which incident the plaintiff is engaged in ongoing litigation with the United States Government. Pending before the Court are the defendants' motion for summary judgment and the plaintiff's cross-motion for summary

judgment.  *See generally* Defs.' Mot. Summ. J. ("Defs.' Mot."), ECF No. 32; Pl.'s Cross-Mot.

Summ. J. ("Pl.'s Cross-Mot."), ECF No. 34.  For the reasons set out below, the defendants'

motion is granted, and the plaintiff's motion is denied.

## I.     BACKGROUND

Summarized below is the factual background underlying the plaintiff's FOIA request and

review of the defendants' responses to the FOIA request.

### A. 2004 INCIDENT AT PLAINTIFF'S OIL PLATFORM

The plaintiff submitted a FOIA request in August 2015 for agency records regarding

statements that BSEE posted on its website three months earlier, in May 2015, concerning the

plaintiff's ongoing response to a 2004 incident that had occurred at the plaintiff's former oil

platform, called "MC20," in the Gulf of Mexico.  Defs.' Mot., Attach. 1, Defs.' Stmt. of Material

Facts ("Defs.' SMF") ¶¶ 1–2, ECF No. 32-1; *id.*, Attach. 2, Decl. of Sean R. Gajewski, Attorney,

Coast Guard Judge Advocate General's Office of Claims and Litigation ("USCG Decl."), Ex. A,

ECF No. 32-2.  The plaintiff was considered the "responsible party" in the incident, which

"result[ed] from damage to the oil production platform and 25 connected wells during Hurricane

Ivan."  Defs.' Mot., Attach. 4, Decl. of Karen Miller, Chief, FOIA/Records Office, Gulf of

Mexico Region ("GOMR"), BSEE ("BSEE Decl."), Ex. A at 7, ECF No. 32-4.  The plaintiff has

since collaborated with the defendant agencies, each of which has jurisdiction over the response

to the events at MC20.  *See id.*  Together, the plaintiff, BSEE, BOEM, and USCG have "worked

continuously" under a Unified Command ("UC") to prevent and control the discharge, improve

the effectiveness of containment around the leaking oil, and mitigate environmental impacts."

*Id.*

In the years since the spill, the plaintiff has been involved in the site clearance and decommissioning of the MC20 "A" platform and twenty-five wells that were buried in 2004 as a result of a massive mudslide during Hurricane Ivan.[1]  *See* Reply Supp. Defs.' Mot. Summ J. & Defs.' Opp'n Pl.'s Cross-Mot. Summ. J. & ("Defs.' Reply"), Attach. 3, Suppl. Decl. of Karen Miller, Chief, FOIA/Records Office, GOMR ("BSEE Suppl. Decl.") ¶ 16, ECF No. 37-3.  To cover the costs of site clearance and decommissioning, the plaintiff, in 2008, put $666,000,000 into trust, with an agreement that "allocated specific amounts of money from the trust to be used to reimburse Taylor Energy for expenses incurred in the decommissioning of the MC-20 site, including the plugging and abandonment of wells."  *Id.* ¶¶ 16–17.  In 2014, sixteen wells remained unplugged and $433,000,000 remained in the trust fund.  *Id.*  At that time, the plaintiff "submitted a departure request from intervention well and decommissioning requirements at 30 C.F.R. §§ 250.1710-250.1717" covering the sixteen wells that had not yet been plugged because the wells had "little or no potential to flow, and . . . it was technically infeasible to drill any additional wells."  *Id.* ¶ 18.

After submitting the departure request, the plaintiff asked BSEE to "consider returning some or all of the remaining trust fund money to Taylor."  *Id.* ¶ 19.  BSEE sought legal counsel from the Department of Justice ("DOJ") in connection with the plaintiff's request and to respond to DOJ's request for information from BSEE "in the context of this attorney-client relationship," BSEE drafted a seven-page April 3, 2015 memorandum that was used by BOEM, BSEE, and the agencies' lawyers.  *Id.* ¶ 20; Defs.' Reply, Attach. 2, Suppl. Decl. of Natasha Alcantara, FOIA

---

[1]    During this time, plaintiff has been involved in at least three lawsuits related to the spill and the subsequent mitigation efforts.  *See Taylor Energy Co. v. United States*, Civ. No. 16-12 (NBF) (Fed. Cl. May 10, 2017) (action for refund of the trust that was established to cover costs related to the decommissioning of the MC20 site); *Riverkeeper v. Taylor Energy Co.,* 117 F. Supp. 3d 849, 851 (E.D. La. 2015) (action under the Resource Conservation Recovery Act regarding discharge of oil into Gulf of Mexico); *Waterkeeper All. v. U.S. Coast Guard*, Civ. No. 13-289 (RMC), 2014 WL 5351410 (D.D.C. Sept. 29, 2014) (action under FOIA in which plaintiff was an intervenor-defendant).

Officer, BOEM ("BOEM Suppl. Decl.") ¶ 11, ECF No. 37-2. In particular, BSEE's Regional Director, GOMR, Lars Herbst, drafted the memorandum with help from DOI's Office of the Solicitor ("SOL"). BSEE Suppl. Decl. ¶ 21. "[I]n its final form," the memorandum, entitled "Taylor Energy Company LLC, Mississippi Canyon Block 20 - BSEE's Considerations for Revision of Taylor Energy's Trust Agreement," was approved by BSEE Director Brian Salerno "to inform discussions between BSEE and DOJ," and "Director Salerno's Office sent this memorandum to DOJ on April 3, 2015." *Id.* ¶¶ 16, 21.

Later in April, BOEM officials received a "BSEE memorandum dated April 3, 2015," with the same author, Mr. Herbst, and title as the aforementioned memorandum, that had been sent by "an attorney in [SOL] in order to inform BOEM's feedback on [a] draft 20-point document" addressing the plaintiff's requests. BOEM Suppl. Decl. ¶¶ 6, 11–12, Ex. A. On May 11, 2015, BSEE sent the plaintiff "a final decision denying Taylor's departure request." BSEE Suppl. Decl. ¶ 22, Ex. D. "Shortly thereafter, Taylor was informed that trust funds would not be returned at that time." *Id.* ¶ 22. A few months later, on January 4, 2016, the plaintiff sued the United States in the Court of Federal Claims for breach of the trust agreement and for breach of "its obligation of good faith and fair dealing by refusing to direct release to Taylor of the funds remaining in the trust account." *See* BSEE Suppl. Decl. ¶ 23 (citing *Taylor Energy Co. v. U.S.*, 1:16-cv-12).[2]

## B. PLAINTIFF'S FOIA REQUEST

Around the time of BSEE's denial of the plaintiff's departure request, in May of 2015, BSEE posted material on its website concerning the incident at MC20, including a "Joint DOI-USCG Statement" pertaining to the "Taylor Energy/Mississippi Canyon 20 (MC20) Oil

---

[2] The case has been stayed while the parties engage in settlement talks. *See* Order at 1, *Taylor Energy Co. v. United States*, Civ. No. 16-12 (NBF) (Fed. Cl. May 10, 2017), ECF No. 39.

Discharge," and links to two documents named "Taylor Energy Oil Discharge at MC 20 Site and Ongoing Response Efforts" and "Taylor Energy U.S. Coast Guard Fact Sheet." Compl. ¶ 20; BSEE Decl., Ex. A. After learning of these online materials, the plaintiff filed identical FOIA requests with BSEE, BOEM and USCG, on August 3 and 4, 2015. USCG Decl., Ex. A; Defs.' Mot., Attach. 3, Decl. of Natasha Alcantara, FOIA Officer, BOEM, Ex. A ("BOEM Decl."), ECF No. 32-3; BSEE Decl., Ex. A. This FOIA request had three parts. The first part sought "all studies, analyses, memorandum, and correspondence between and among the United States Department of the Interior, BSEE, BOEM and the USCG that support" four enumerated statements on the BSEE website. Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 1.[3] The second part of the FOIA request sought "all correspondence (emails, letters, faxes and any other correspondence) relating to" a statement about a joint aerial observation workshop that the UC led in August 2014, with a specific request for documentation about the methodology used to estimate the quantity and rate of discharge. Defs.' Mem. at 2.[4] Finally, the third part of the FOIA request sought "all correspondence, and FOIA-related correspondence (emails, letters, faxes and any other correspondence) relating to Taylor or MC20 between the USCG and the Associated Press and Michael Kunzelman." *Id.*

---

[3] The four website statements set out in the FOIA request are: (a) "BSEE's current estimate is that the oil discharge from the site, if left unchecked, could continue for 100 years or more."; (b) "However, because the discharge volume is greater than can reasonably be accounted for by oil released from sediment only, oil is most likely emanating from one or more of the 25 wells."; (c) "Significant uncertainty exists about future events, including discharge sources, cross-flows, pressure recharge in the oil reservoirs, evolving technology, and suitable remedial measures."; (d) "the specific source(s) of discharge at the MC-20 site are not fully known." Defs. Mem. at 1–2.

[4] The website statement at issue in the second part of the FOIA request is as follows: "In August 2014, the UC led a joint aerial observation workshop that included the Coast Guard, BSEE, NOAA, and Taylor Energy's representatives and contractors. At that workshop, the aerial observation methodology used to estimate quantity and rate of discharge was reviewed and revised." Defs.' Mem. at 2. This part of the FOIA request asks that the agencies "specifically include the documentation that the methodology used to estimate quantity and rate of discharge was revised." *Id.*

All three agencies responded to the plaintiff's FOIA request. BOEM responded, on

September 8, 2015, stating that it anticipated a delay in responding. BOEM Decl., Ex. D. at 2–3.

BSEE produced, on October 7, 2015, a partial response totaling 188 pages, including 69

documents in full, BSEE Decl. ¶ 19, and, on November 10, 2015, acknowledged the plaintiff's

request for an update on further production, without providing any timeline for further

production, BSEE Decl., Ex. F. The USCG produced, on November 12, 2015, an interim

response of 249 pages of documents, which response the plaintiff appealed on December 11,

2015. USCG Decl. ¶¶ 13, 16. "[D]ue to Defendants' failure to timely respond to Taylor's

requests and failure to timely respond to Taylor's appeals," the plaintiff filed the instant suit.

Compl. ¶ 2.

## C. THE FOIA LAWSUIT

The plaintiff filed this FOIA lawsuit on February 25, 2016, to compel the defendants to

produce the requested records or declare that no such documents exist, and provide a final

determination on the plaintiff's FOIA requests. Compl. at 13. The plaintiff also sought relief

under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*—a claim that this

Court has since dismissed.[5] At the time that the plaintiff filed the instant lawsuit, the agencies

were still in the process of searching for responsive records. *See* BOEM Decl. ¶¶ 31–35; BSEE

---

[5] One month after filing suit, under both the FOIA and the APA, Compl. ¶¶ 11–19, the Plaintiff moved for summary judgment, *see* Pl.'s' Mot. Summ. J. ¶ 1, ECF No. 15-1, which motion was denied because the 20-day statutory deadline for response to a FOIA request does not require agencies to "actually produce documents within the relevant time period." Minute Order (dated May 10, 2016) (citing *Citizens for Responsibility & Ethics in Wash. v. FEC*, 711 F.3d 180, 182 (D.C. Cir. 2013)). Rather, an agency need only make a "determination" as to the disposition of potential records. *Id.* An agency failing to adhere to this 20-day deadline only loses the ability to cite the "administrative exhaustion requirement to keep cases from getting into court." *Id.* at 189. At the same time, the defendants' Motion to Dismiss the plaintiff's APA claim, *see* Defs' Mot. Dismiss, ECF No. 27, was granted because the law is well-settled that "APA claims arising out of an agency's response to a FOIA request must be dismissed when they seek relief that can be obtained through a FOIA claim itself." *Muttitt v. U.S. Cent. Command*, 813 F. Supp. 2d 221, 226 (D.D.C. 2011). The defendants' Motion to Stay Proceedings, *see* Defs.' Stay Mot., ECF No. 27, which the defendants argued was necessary to allow the agencies to search and process responsive materials, was denied, and a scheduling order imposed. Minute Order (dated May 10, 2016).

Decl. ¶¶ 14–21; USCG Decl. ¶¶ 6–29.  During that process, BSEE provided the plaintiff with an opportunity to narrow its request in an effort to "expedite the bureau's response."  BSEE Decl. ¶ 23.  The plaintiff agreed to narrow the first part of the FOIA request, as reflected by the bold language, to "produce all studies, analyses, memorandum, and correspondence **upon which the author or authors of the Joint DOIA-USCG statements relied in stating**" the four specific statements from the website.  BSEE Decl., Ex. J at 1–2 (emphasis in original).[6]  The plaintiff now challenges the adequacy of BSEE's search with respect to this narrowed first part of the FOIA request.

The agencies each completed their responses to the plaintiff's FOIA requests during 2016.  *See* BOEM Decl. ¶¶ 37–38 (describing BOEM productions on April 6, 2016 and May 24, 2016); BSEE Decl. ¶¶ 27–31 (describing BSEE productions on November 4, 2016 and November 17, 2016); USCG Decl. ¶ 39 (describing USCG productions on September 13, 2016); *see generally* Defs.' SMF (describing agency searches leading to productions).  BOEM produced a total of five documents responsive to the FOIA request, including eleven pages in full and two redacted pages, and withheld 163 responsive documents under Exemption 5.  *See* BOEM Decl. ¶¶ 36–37; *see also id.*, Ex. E–F.  BSEE produced a total of 15,377 pages of responsive material, BSEE Decl. ¶ 28, including a number of documents already in the plaintiff's possession, *id.* ¶¶ 25–26.  BSEE withheld in full or in part: 47 documents, totaling 596 pages, under Exemption 5; two documents, totaling sixteen pages, under both Exemptions 5 and 9; and two documents, totaling eight pages, under Exemption 6.  *Id.* ¶ 27.  The USCG produced 473 pages of responsive documents, USCG Decl. ¶ 35, and withheld 359 pages, in full, and 153 pages, in part, *id.* ¶ 34.  In sum, the defendants produced to the plaintiff over 15,000 pages of responsive records.

---

[6]     The plaintiff also narrowed the second part of the FOIA request to state: "'Correspondence' does not include the daily sheen volume reports provided by Taylor to the federal government."  BSEE Decl., Ex. J at 2.

The plaintiff now disputes the adequacy of BSEE's search with respect to the narrowed first part of the FOIA request and the invocation by BSEE and BOEM of FOIA of Exemption 5 to withhold, in full or part, five documents.[7] Those five documents are drafts of the April 3, 2015 memorandum related to the plaintiff's request for departure and return of trust funds, and parts of transmittal emails.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)).  Indeed, the D.C. Circuit has observed that "the vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by generally requiring federal agencies to make their records available to the public on request." *DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (citing *U.S. Dep't of Justice*

---

[7]      The plaintiff does not contest, and the defendants' motion for summary judgment is therefore granted, as conceded, with respect to the following parts of the defendants' motion: (1) discharge of the USCG's FOIA obligations; (2) BSEE's withholdings under Exemptions 6 and 9; and (3) BOEM's withholdings under Exemption 6. *See* Pl.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Defs.' Mot. Summ. J. ("Pl.'s Mem.") at 7 (stating that "[t]o conserve the resources of the parties and the Court, although Taylor believes several of the USCG's *Vaughn* index fail to meet the legal standard, Taylor's Motion seeks to obtain updated *Vaughn* indices for the documents withheld by BSEE and BOEM," thereby conceding any further claim against USCG, and not contesting withholdings under Exemptions 6 or 9); Defs.' Reply at 1, ECF No. 37 ("The only exemption that Plaintiff challenges is the assertion of Exemption 5 by both BOEM and BSEE.").

*v. Julian*, 486 U.S. 1, 8 (1988)).  Reflecting the necessary balance between the public's interest in governmental transparency and "legitimate governmental and private interests that could be harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010), the FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. U.S. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citations omitted); *see also Murphy v. Exec. Office for U.S. Attys.*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice (CREW)*, 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).  "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose,* 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA, 'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904 (D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (finding that the agency invoking an exemption bears the burden "to establish that the requested information is exempt"); *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014).  This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt

from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur,'" *Pub. Citizen Health Research Grp.*, 185 F.3d at 904–05 (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).

An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld, to enable the court to fulfill its duty of ruling on the applicability of the exemption, and to enable the adversary system to operate by giving the requester as much information as possible, on the basis of which the requester's case may be presented to the trial court.[8]  *See CREW*, 746 F.3d at 1088 (noting that an agency's burden is sustained by submitting an affidavit that "'describe[s] the justifications for nondisclosure with reasonably specific detail, demonstrate[s] that the information withheld logically falls within the claimed exemption, and [is] not controverted by either contrary evidence in the record nor by evidence of agency bad faith'" (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))); *Judicial Watch*, 726 F.3d at 215 (noting that "summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith" (internal quotation marks and alteration omitted)); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that an agency's description "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the

---

[8]     "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and it explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).

requestor with a realistic opportunity to challenge the agency's decision.") (internal citation omitted). While "an agency's task is not herculean" it must "'describe the justifications for nondisclosure with reasonably specific detail' and 'demonstrate that the information withheld logically falls within the claimed exemption.'" *Murphy*, 789 F.3d at 209 (quoting *Larson*, 565 F.3d at 862). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption." *Summers v. U.S. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998). In addition, the court has an "affirmative duty" to consider whether the agency has produced all segregable, non-exempt information. *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (referring to court's "affirmative duty to consider the segregability issue *sua sponte*") (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007)); *Stolt–Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld.") (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007))); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court

had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff."); *see also* 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III. DISCUSSION

The plaintiff challenges two aspects of the defendants' responses to the FOIA requests at issue: (1) the adequacy of BSEE's search in response to the plaintiff's narrowed request; and (2) whether BOEM and BSEE properly invoked Exemption 5 to withhold in part, under the deliberative privilege process and the attorney-client privilege, five documents, including the text of three versions of the April 3, 2015 memorandum, as well as related email chains. *See* Pl.'s Reply Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 1. As discussed below, the defendants have met their burden for demonstrating both the adequacy of BSEE's search and that Exemption 5 protects from disclosure the challenged withheld material in the documents.

### A. BSEE'S SEARCH WAS ADEQUATE

The plaintiff challenges the adequacy of BSEE's search in response to the narrowed request for "documents upon which the author or authors of the Joint DOI-USCG statements relied," Pl.'s Reply at 2, because, in the plaintiff's view, the agency's search did not use methods "reasonably expected to produce the information requested," *id*. (citing *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)). The Court disagrees. Based upon the detailed description of how the search was conducted, BSEE has met its burden of showing that the search was adequate.

### 1. Legal Standard For Evaluating Adequacy of FOIA Search

Federal agencies, upon receiving a FOIA request, are "required to perform more than a perfunctory search" to identify potential responsive records. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011). Instead, the agency bears the burden of demonstrating that it "made a 'good faith effort to conduct a search using methods which can be reasonably expected to produce the information requested.'" *DiBacco v. U.S. Army,* 795 F.3d at 188 (internal alterations omitted); *see also Clemente v. Fed. Bureau of Investigation*, 867 F.3d 111, 117 (D.C. Cir. 2017) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). To meet this burden, the agency must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). "The adequacy of an agency's search is measured by a 'standard of reasonableness,' and is 'dependent upon the circumstances of the case.'" *Truitt*, 897 F.2d at 542 (quoting *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)). While agencies have a duty to construe FOIA requests liberally, *Nation Magazine*, 71 F.3d at 890, FOIA requires only that the agency conduct a reasonable search tailored to the "four corners of the request," *Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013) (quoting *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003)).

At the summary judgment stage, an agency may meet this burden by submitting a "'reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'" *Ancient Coin Collectors Guild*, 641 F.3d at 514 (quoting *Valencia–Lucena*, 180 F.3d

at 326). Such an affidavit must "'explain in reasonable detail the scope and method of the search conducted by the agency.'" *See Morley,* 508 F.3d at 1121 (internal alterations omitted) (quoting *Perry v. Block,* 684 F.2d 121, 127 (D.C. Cir. 1982)). "Agency affidavits—so long as they are 'relatively detailed and non-conclusory'—are 'accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *Mobley v. CIA,* 806 F.3d 568, 581 (D.C. Cir. 2015) (quoting *SafeCard Servs., Inc. v. SEC,* 926 F.2d 1197, 1200 (D.C. Cir. 1991)); *see also DeBrew v. Atwood,* 792 F.3d 118, 123 (D.C. Cir. 2015). Only where "a review of the record raises substantial doubt, particularly in view of 'well defined requests and positive indications of overlooked materials,'" should summary judgment be denied. *Iturralde v. Comptroller of Currency,* 315 F.3d 311, 314 (D.C. Cir. 2003) (quoting *Valencia-Lucena,* 180 F.3d at 326); *see also Aguiar v. Drug Enf't Admin.,* 865 F.3d 730, 738 (D.C. Cir. 2017) (same).

The adequacy of a FOIA search is judged not by the results of an agency's search but by the appropriateness of the agency's search methods. *Iturralde,* 315 F.3d at 315 (citations omitted). Thus, a search is not automatically rendered inadequate by an agency's failure to locate a specific document, *id.,* nor by an agency's refusal to take every step desired by a requester, *Wright v. Admin. for Children and Families,* Civ. No. 15-218, 2016 WL 5922293, at *6 (D.D.C. Oct. 11, 2016) (citing *Valencia-Lucena,* 180 F.3d at 325). Agencies are permitted to tailor search terms for the requested information in accordance with their own internal procedures for tagging or labeling documents. *See Voinche v. FBI,* 412 F. Supp. 2d 60, 66 (D.D.C. 2006). "The law is clear that FOIA does not provide requesters with a right to demand 'an all-encompassing fishing expedition' of files in every office within an agency." *Cause of*

*Action v. Internal Revenue Serv.*, Civ. No. 13-0920 (ABJ), 2017 WL 2304318, at *8 (D.D.C. May 25, 2017) (quoting *Dale v. IRS*, 283 F. Supp. 2d 99, 105 (D.D.C. 2002)).

### 2. Analysis of BSEE's Search

BSEE has submitted two declarations, which together address the agency's search and review of responsive records. *See* BSEE Decl. ¶¶ 14–31; BSEE Suppl. Decl. ¶¶ 4–10. BSEE's declarant and Chief of the FOIA/Records Office for GOMR coordinated and directed the search, and "determined that documents responsive to this request would potentially be located in BSEE HQ or any part of BSEE's GOMR Office, including our GOMR District Offices (which include New Orleans, Houma, Lafayette, Lake Jackson, and Lake Charles, Louisiana), because these were the offices involved with the website statements and joint aerial observation workshop referenced in Plaintiff's request." BSEE Decl. ¶ 14. In addition to identifying certain BSEE offices to search, a list of agency officers were identified to coordinate searches because "these were the agency employees involved with the website statements and joint aerial observation workshop referenced in Plaintiff's request." *Id.* ¶ 15.

To locate records related to the four statements identified in the first part of the FOIA request, BSEE officers "searched all their electronic and paper records, and directed those employees who report to them and who they reasonably believed might potentially have responsive records to search their records as well." *Id.* ¶ 16. Furthermore, the multiple "[s]earch terms used included the following: Taylor, TEC, Unified Command Center, FRAC, ERA or Ecological Risk Assessment, Sheen, and Flyover," and, "[t]he e-mail searches spanned two e-mail systems, since BSEE changed systems in 2012." *Id.* As a result, BSEE "collected approximately 80,000 pages of potentially responsive material," *id.* ¶ 18, which were reviewed to produce "15,377 pages of responsive material in full to Plaintiff in response to its FOIA request,"

while withholding "a total of 596 pages of responsive material in part or in full under one or more of FOIA's exemptions," *id*. ¶ 28.

After the plaintiff challenged the defendants' affidavits as "conclusory," Pl.'s Mem. at 12–14, the defendants filed BSEE's Supplemental Declaration providing further details addressing the issues raised by the plaintiff. *See* BSEE Suppl. Decl. ¶¶ 4–10. First, in response to the plaintiff's contention that the BSEE "'believed,' but did not confirm, that . . . the agency employees," contacted for the search were the individuals "involved in the website statements," Pl.'s Mem. at 13, BSEE clarifies that "the GOMR Supervisors for each program office" were contacted based on their experiences with the "subject matter of the [plaintiff's] request," BSEE Suppl. Decl. ¶ 5.

Second, in response to the plaintiff's challenge to the BSEE's "broad search terms," and "cursory summary of BSEE's search" as not in "good faith," Pl.'s Mem. at 13, BSEE explains that the statements referenced in the plaintiff's FOIA request were not used "as search terms because such a search would not have been effective in producing 'all studies, analyses, memorandum, and correspondence upon which the author or authors of the Joint DOI USCG statements relied,' as described in Part 1 of Plaintiff's narrowed request." BSEE Suppl. Decl. ¶ 8. Rather, and obviously, "[s]uch a search would only have turned up a subset of the information sought: documents that actually included the precise language of the website statements." *Id*. Furthermore, "the website statements were a product of intra- and interagency consultations, and there was no single agency 'author' or 'authors' such that [BSEE] could simply search the records or one or more individuals to find all responsive or potentially records." *Id*. ¶ 9.

Finally, in response to the plaintiff's contention that BSEE did not explain how the agency ultimately determined that over 50,000 pages were not responsive to the plaintiff's

request, the agency explained that "the discrepancy between the estimate of [80,000] documents to review and the number of responsive documents ultimately produced" resulted from the "many duplicates of the same documents produced in the initial search." *Id.* ¶ 7. Moreover, "[i]ndividual custodians, as well as offices, often produced multiple copies of the same record," and "a significant number of the potentially responsive documents gathered, although pertaining to wells in MC 20, were not otherwise relevant to Plaintiff's request." *Id.*

Notwithstanding these fulsome explanations, the plaintiff persists in challenging BSEE's good faith effort to conduct a reasonable search largely because BSEE did not conduct a search by the authors of the website statements enumerated in the FOIA request. Pl.'s Reply at 3 (rationalizing that "[t]he website did not write itself" and criticizing the agency for not consulting "an author or multiple authors who would be familiar with the sources on which that author or authors relied in drafting the wording that appeared on the website."). The plaintiff argues that a search of the individual authors involved in the drafting of BSEE's website content should have produced evidence of the "inter or intra-agency effort to draft" the website text, and such evidence of drafts would have allowed the plaintiff to discover the sources upon which those authors relied in creating the website content. *See id.* For these reasons, the plaintiff contends that the BSEE has not met its burden to show the agency conducted a reasonable search in response to the plaintiff's request for documents forming the basis of the Joint DOI-USG statements.[9]

---

[9]    The plaintiff relies, without explanation, on a non-binding and distinguishable case, *Beltranena v. Clinton*, 770 F. Supp. 2d 175, 182–83 (D.D.C. 2011), to support its criticism of the agency's search. Pl.'s Reply at 3; Pl.'s Mem. at 14. In *Beltranena*, the Department of State did not meet its burden of showing the reasonableness of the searches conducted because the agency's declaration failed to describe who performed the searches, how the searches were performed, or why or which search terms were used. *Beltranena*, 770 F. Supp. 2d 183–84. By contrast, the defendants in the instant case have detailed a list of individuals who performed searches, the reasonable basis for choosing those individuals, a list of search terms, an explanation of how the search was narrowed, and a reasonable explanation for why BSEE took a broad approach to its search. *See* BSEE Decl. ¶¶ 14–31; *see also* BSEE Suppl. Decl. ¶¶ 4–10.

The plaintiff's criticisms of BSEE's search are not persuasive for at least two reasons. First, to the extent that the plaintiff's criticism of BSEE's search is predicated on the search results not producing drafts of the website text, this challenge is on weak ground and does not render the search inadequate. Simply put, the adequacy of an agency's search is judged by the methods utilized and not by the results of the search. *See Iturralde*, 315 F.3d at 315. Notably, the plaintiff does not allege that BSEE's search failed to produce *any* document containing the website text enumerated in the FOIA request, but rather that additional sources used by the authors in drafting that text may exist. *See* Pl.'s Reply at 3. The plaintiff, however, simply points to no "positive indication" that certain materials have actually been overlooked, *cf. Valencia-Lucena*, 180 F.3d at 326–27 (finding such a "positive indication" when the agency "fail[ed] to search the center it had identified [in the record] as a likely place where the requested documents might be located"), and thus the plaintiff's claims of the search's inadequacy seem merely speculative.

Indeed, the standard of adequacy for a search is one of "reasonableness" and "*not* whether any further documents might conceivably exist." *See Truitt*, 897 F.2d at 542 (emphasis in original) (citing *Weisberg*, 705 F.2d at 1351). When, as here, an agency has provided "relatively detailed and non-conclusory" affidavits, those affidavits are "accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *Mobley*, 806 F.3d at 581 (quoting *SafeCard Servs.*, 926 F.2d at 1200) (internal quotation marks omitted). Thus, the plaintiff would need to provide more than just an assertion that the "website did not write itself," Pl.'s Reply at 3, and speculation that additional searches may produce draft documents to show a lack of good faith, such that BSEE's failure to turn up certain drafts renders the search inadequate.

The second reason why the plaintiff's challenge to BSEE's search is unpersuasive stems from the principle that, in responding to a FOIA request, an agency "need not knock down every search design advanced by every requester." *DiBacco*, 795 F.3d at 191. This principle is especially relevant here where the plaintiff's search design essentially poses interrogatories to agency employees to determine whether and which such employees may have authored the website text at issue, in order to pose further interrogatories concerning sources on which those employees may have relied. *See Wisdom v. U.S. Trustee Program*, Civ. No. 15-1821 (JEB), 2017 WL 3842117, at *5 (D.D.C. Sept. 1, 2017) (noting that "although thoroughness is certainly preferable, FOIA requests are not interrogatories; as long as the Agency provided all responsive documents to all request categories and listed all those withheld, it has complied with the statute."); *Powell v. IRS*, Civ. No. 16-1682 (JEB), 2017 WL 2533348, at *7 (D.D.C. June 9, 2017) (observing that "FOIA only requires that an agency turn over <u>records</u>, not that it provide a requestor with specific information or answer questions" (citing *Willaman v. Erie Bureau of Alcohol Tobacco Firearms & Explosives*, 620 F. App'x 88, 89 (3d Cir. 2015) ("It is clear . . . that nothing in the [FOIA] requires answers to interrogatories but rather and only disclosure of documentary matters which are not exempt."); *Di Viaio v. Kelley*, 571 F.2d 538, 542–43 (10th Cir. 1978) (same); and *Hedrick v. FBI*, 216 F. Supp. 3d 84, 95 (D.D.C. 2016))).

In the instant case, BSEE was not required to answer the plaintiff's interrogatories by taking the plaintiff's desired steps. BSEE did not search by authors' names and instead used broader search terms because the agency believed the broader search terms would produce a greater number of responsive documents. BSEE Suppl. Decl. ¶ 8. Indeed, BSEE explains, the results of a search with only authors' names would produce results that, though possibly including responsive records, would not truly include the breadth of sources utilized by the

agency.  BSEE Suppl. Decl. ¶ 8.  In this respect, BSEE's process of winnowing down more than 80,000 pages appears to be even more inclusive than the search suggested by plaintiff.

Accordingly, the Court concludes that BSEE submitted satisfactory declarations detailing the adequacy of its search and thus upholds the adequacy of that search.  The plaintiff's request for an injunction requiring defendants to conduct an additional search is denied.

**B. APPLICATION OF EXEMPTION 5**

The parties dispute the defendants' withholding under Exemption 5, pursuant to the attorney-client privilege and the deliberative process privilege, of a seven-page April 3, 2015 memorandum, as well as earlier versions of the memorandum and associated email chains.  Pl.'s Reply at 4–5.  The two documents in dispute withheld in part by BOEM are:

(1) BOEM 000001-000016, "an email chain among SOL [Office of Solicitor] attorneys and BOEM employees," which BOEM has now released in its entirety, including titles of the attachments, with the exception of a single email; and

(2) BOEM 000019-000025, "[A] BSEE memorandum dated April 3, 2015, from Lars Herbst, Regional Director, GOMR, to Brian Salerno, Director, entitled 'Taylor Energy Company LLC, Mississippi Canyon Block 20 - BSEE's Considerations for Revisions of Taylor Energy's Trust Agreement,'" which BOEM received from an attorney in SOL and the body of which BOEM continues to withhold.

BOEM Suppl. Decl. ¶¶ 8, 11–12.

The three documents in dispute withheld in part by BSEE are:

(1) GOMRBSEE000922-925, "an email chain between BSEE officials and attorneys from [SOL]," which the BSEE has released, in part, with the exception of four emails;

(2) GOMRBSEE00926-939, which "consists of two different drafts of the [April 3, 2015]

memorandum," which were attached to transmittal emails, and "both of which

include comments and redline edits by BSEE officials and SOL attorneys," and the

bodies of which BSEE continues to withhold; and

(3) GOMRBSEE000914-921, which is "a nearly final, but unsigned, version of the same

memorandum attached to a transmittal email from Charlyn Spies [of BSEE] to Lars

Herbst (GOMRBSEE000914)," the body of which BSEE continues to withhold.

BSEE Suppl. Decl. ¶¶ 11, 15. The sufficiency of the defendants' explanations for the

withholding and redactions of these documents under Exemption 5 are addressed next.[10]

### 1. Overview of FOIA's Exemption 5

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or

letters that would not be available by law to a party other than an agency in litigation with the

agency." 5 U.S.C. § 552(b)(5). Thus, if a document requested through FOIA "'would be

"routinely" or "normally" disclosed [in civil discovery] upon a showing of relevance,' it must

also be disclosed under FOIA; conversely, information which is routinely protected in discovery

falls within the reach of Exemption 5." *Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d

508, 516 (D.C. Cir. 1996) (citing *FTC v. Grolier,* 462 U.S. 19, 26 (1983) (internal quotation

---

[10]     The plaintiff contends that the defendants have not met their burden because their *Vaughn* indices are insufficient, Pl.'s Reply at 3–5, but these indices must be evaluated in combination with any declarations to determine whether an agency has met its burden, *see Morley*, 508 F.3d at 1123 (discussing *Vaughn* index and agency affidavit "work[ing] in tandem"). *See also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (holding that the combination of a *Vaughn* index and an agency's declaration were "the very factors" that the court "had previously deemed sufficient" for the decision to withhold documents under Exemption 5); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006) (finding that a "combined approach" to respond to a FOIA request, where both declarations and an index were used, was proper); *Johnson v. Exec. Office for U.S. Atty's*, 310 F.3d 771, 776 (D.C. Cir. 2002) ("The combination of the *Vaughn* index and the affidavits . . . are sufficient to fulfill the agency's obligation to show with 'reasonable specificity' why a document cannot be further segregated" (quoting *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578–579 (D.C. Cir. 1996)). Given the detailed explanations that BOEM and BSEE provide in their declarations for withholding and redacting material in the five contested documents, any shortcomings in the *Vaughn* indices are not the measure of the sufficiency of the defendants' explanations for withholdings.

marks omitted)).  Indeed, Exemption 5 covers "those documents, and only those documents, normally privileged in the civil discovery context."  *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 (1975)).  This exemption "incorporates the privileges that the Government may claim when litigating against a private party, including the governmental attorney-client and attorney work product privileges, the presidential communications privilege, the state secrets privilege, and the deliberative process privilege."  *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).

"The attorney-client privilege 'is the oldest of the privileges for confidential communications known to the common law,'" and it aims "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice."  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 169–170 (2011) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)).  "The objectives of the attorney-client privilege apply to governmental clients" seeking to obtain "legal advice founded on a complete and accurate factual picture," and thus "the Government may invoke the attorney-client privilege in civil litigation to protect confidential communications between Government officials and Government attorneys."  *Id.*  "Like all privileges . . . the attorney-client privilege is narrowly construed and is limited to those situations in which its purposes will be served."  *Coastal States Gas Corp. v. Dep't of Energy,* 617 F.2d 854, 862 (D.C. Cir. 1980).  "The privilege 'protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.'"  *Id.* (quoting *Fisher v. United States*, 425 U.S. 391, 403 (1976)).  To establish that the attorney-client privilege applies in the FOIA context, a defendant must show that (1) "the information in [the] documents was communicated to or by an attorney as part of a professional relationship," (2) "the

information is confidential," and (3) the "communication is based on confidential information provided by the client." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 253–54 (D.C. Cir. 1977).

The deliberative process privilege, which is intended to protect "open and frank discussion" among government officials to enhance the quality of agency decisions, allows federal agencies to withhold "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001). "To qualify for the deliberative process privilege, an intra-agency memorandum must be both pre-decisional and deliberative." *Abtew*, 808 F.3d at 898 (citing *Coastal,* 617 F.2d at 866 (D.C. Cir. 1980)); *Whitaker v. U.S. Dep't of State*, No. 14–5275, 2016 WL 9582720, at *2 (D.C. Cir. Jan. 21, 2016) (per curiam) (quoting *Abtew*, 808 F.3d at 898). In general, "[a] document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft,* 421 U.S. 168, 184 (1975)); *see also Leopold v. CIA*, 89 F. Supp. 3d 12, 19 (D.D.C. 2015) (quoting *Petroleum Info. Corp.,* 976 F.2d at 1434). While the D.C. Circuit has observed that the "term 'deliberative' does not add a great deal of substance to the term 'pre-decisional,'" *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) (citing *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1195 (D.C. Cir. 1991), "'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue," *id.* (citing *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982)).

## 2. Analysis of Documents under Exemption 5

BSEE and BOEM contend that the disputed material has been properly withheld under the attorney-client and deliberative process privileges because the five documents consist of a single April 3, 2015 memorandum, with associated drafts, and emails that contain confidential communications from agency attorneys relating to litigation and dispute-resolution matters with the plaintiff. *See* Defs.' Reply at 3. In addition, the agencies assert that the deliberative process privilege applies because the memorandum "'was an inter-agency document developed by BSEE at the request of DOJ' in considering Plaintiff's requests for a departure relating to its MC-20 platform and revision of the trust agreement, no final decision had been made at the time regarding those requests, and 'BSEE was working with DOJ [at that time] to determine what approach was appropriate or advisable.'" *Id*. at 4.[11]

---

[11] The plaintiff seeks to avoid application of Exemption 5 on the ground that statements in BSEE and BOEM's supplemental declarations regarding the agencies' interactions with the Department of Justice are not "admissible" because neither of the agencies' declarants "provides admissible evidence of personal knowledge of the Department of Justice's alleged request or BOEM and BSEE's compliance with that request." Pl.'s Reply at 5. Consequently, in the plaintiff's view, the agency declarants' statements that the disputed memo "was actually requested by the Department of Justice in response to a request from Department of Justice attorneys for information related to ongoing disputes with Taylor" should be disregarded in evaluating application of the attorney-client privilege. *Id*. The plaintiff's view is erroneous, however, since the use of hearsay in agency FOIA affidavits is generally acceptable. *See SafeCard Servs.*, 926 F.2d. at 1201 (allowing reliance on a "partly second-hand" affidavit of the supervisor of the search at issue when the supervisor had recounted what she learned from other employees) (citing *Meeropol v. Meese*, 790 F.2d 942, 951 (D.C. Cir. 1986) (allowing reliance on the affidavit of the supervisor of the search at issue, even though he necessarily relied upon information from the staff members who actually performed the search))); *Carney v. Dep't of Justice*, 19 F.3d 807, 814 (2d Cir. 1994) ("An affidavit from an agency employee responsible for supervising a FOIA search is all that is needed to satisfy Rule 56(e); there is no need for the agency to supply affidavits from each individual who participated in the actual search."); *Lahr v. NTSB*, 569 F.3d 964, 990 (9th Cir. 2009) (same); *Wisdom v. U.S. Trustee Program*, Civ. No. 15–1821 (JEB) 2017 WL 3842117, at *5 (D.D.C. Sept. 1, 2017) (noting that "FOIA affidavits can be based on hearsay, and there is no requirement that the declarant must have been personally involved in each of the challenged searches"); *Brophy v. U.S. Dep't of Def.*, Civ. No. 05-360 (RMC), 2006 WL 571901, at *4 (D.D.C. Mar. 8, 2006) ("Declarations that contain hearsay in recounting searches for documents are generally acceptable."). Thus, because the defendants' declarants are FOIA Officers responsible for the plaintiff's request, and attest in their respective declarations that their statements are based on "personal knowledge and information" made available to them in their official capacities, *see* BOEM Suppl. Dec. ¶ 1; BSEE Suppl. Dec. ¶ 1, the declarants' statements about the DOJ's request may appropriately be considered in evaluating whether the agencies have met their burden of showing that the contested records were properly withheld under Exemption 5.

The plaintiff counters with two primary arguments. First, the plaintiff contends that a "clear indication on the face of the memo [shows] that it was an internal BSEE memo," Pl.'s Reply at 5, "between two non-attorneys," Pl.'s Mem. at 10, and "the fact that the final memo was eventually forwarded to Lori Monroe, an attorney with the Office of the Solicitor of the Interior does not retroactively grant privileged status to the April 3, 2015 memo," see *id.* (citing *United States v. ISS Marine Servs.*, 905 F. Supp. 2d 121, 128 (D.D.C. 2012)). Second, the plaintiff cites "various gaps and inconsistencies" in the defendants' explanations such that the plaintiff cannot "determine the appropriateness of BOEM and BSEE's claimed Exemptions," Pl.'s Reply at 7, particularly as to the deliberative process privilege, for which the agencies "do not describe the deliberative process involved, nor do they describe the role played by those documents in the process," Pl.'s Mem. at 9. As explained below, BOEM and BSEE have met their burden of demonstrating proper application of the attorney-client privilege to withhold two of the disputed records and of the deliberative process privilege to withhold the three remaining disputed records.[12] The arguments and the application of Exemption 5, with respect to each document, are addressed below.[13]

---

[12] For the same reason, the plaintiff's request to review documents *in camera* is denied. *See* Pl.'s Reply at 4. Documents are generally reviewed *in camera* when an "agency cannot describe the document fully enough to show that it is exempt from disclosure without in the course of doing so disclosing the very information that warrants exemption" *See Simon v. Dep't of Justice*, 980 F.2d 782, 784 (D.C. Cir. 1992). With respect to the attorney-client privilege, in particular, this Circuit has found that "[i]t is neither consistent with FOIA nor a wise use of increasingly burdened judicial resources to rely on in camera review of documents." *Mead Data*, 566 F.2d at 262. In the instant case, the defendants have provided affidavits that meet the prerequisites for demonstrating they have properly applied Exemption 5 to withhold material, and, thus, an *in camera* review of the disputed records is not necessary.

[13] A document is properly withheld if subject to any one exemption or privilege. *See Darui v. U.S. Dep't of State*, 798 F. Supp. 2d 32, 39 (D.D.C.2011) ("[T]he Court need not reach" applicability of alternative exemptions once it has concluded that document is properly withheld under one exemption).

*a)      Four Emails Between BSEE and SOL Regarding the April 3, 2015 Memorandum (GOMRBSEE000922-925)*

BSEE withheld four emails, all dated April 3, 2015, in an email chain identified with Bate-stamp number GOMRBSEE000922-925.  BSEE Suppl. Decl. ¶ 12.  The withheld emails "consist of communications between two BSEE officials: Lars Herbst, Regional Director, BSEE GOMR, and Mike Prendergast, Deputy Regional Director, BSEE, GOMR; and Lori Monroe, an SOL attorney," which "discuss edits being made to a draft memorandum entitled 'Taylor Energy LLC, Mississippi Canyon Block 20 - BSEE's Considerations Regarding Remaining Funds in the Taylor Trust,'" which is the April 3, 2015 memorandum at issue.  *Id.*  BSEE's original *Vaughn* index cites only the deliberative process privilege as the reason for withholding these four emails, *see* BSEE Decl. Ex. N, at 10, but the agency has since clarified that the withholding is based on both the attorney-client and deliberative process privileges, BSEE Suppl. Decl. ¶¶ 13–14.

In particular, BSEE describes the withheld emails as "discussing the draft BSEE memorandum" and "confidential communications between agency officials and an agency attorney, encompassing facts provided by the client, responding to the attorney's request for clarification concerning specific statements in the draft document, and providing advice from the attorney."  BSEE Suppl. Decl. ¶ 13.  These statements not only explain how the redacted emails involved communications with an attorney, but also clearly link the four redacted emails to the "attorney-client relationship" that the BSEE formed with DOJ to obtain "legal counsel" regarding the plaintiff's trust dispute, *see id.* ¶¶ 13, 20, thereby demonstrating that the communications were related to a "professional relationship," *see Mead Data*, 566 F.2d at 254. These explanations are adequate to demonstrate the confidentiality and the reliance on

confidential information underlying the attorney-client privilege and that these four emails were properly withheld under Exemption 5.

b)    *One Email Between BOEM and SOL Regarding the April 3, 2015 Memorandum (BOEM000001-000016)*

BOEM withheld a single email within an email chain, which is identified by Bate-stamp number BOEM00001-000016. BOEM Suppl. Decl. ¶ 8. The email chain consists of communications "among SOL attorneys and BOEM employees," for which emails BOEM has "releas[ed] all the titles and the bodies of all but one of the emails in the chain," as well as identified the BOEM officials involved. *Id.* ¶¶ 8–9. BOEM describes the single email withheld from the email chain as "[t]he attorney's email reports to agency clients about a meeting among SOL attorneys, Coast Guard attorneys, and Department of Justice (DOJ) attorneys on the development of the '20-point document,' and seeks BOEM comments on specific parts of this draft inter-agency document." *Id.* ¶ 9. The communication "related to decisions that the U.S. government was considering during the period covered by the request regarding Plaintiff and the MC20 site," including by "address[ing] the development of a 'Taylor Fact Sheet,' and whether or not a legal mechanism existed that would relieve Taylor of its responsibilities as a responsible party for the oil spill at the [MC20] site." *Id.* ¶ 6. This description amply meets the prerequisites for invocation of the attorney-client privilege and, consequently, the challenged email from within the email chain was properly withheld under Exemption 5.[14]

---

[14]    The plaintiff suggests that the description provided by BOEM cannot be trusted because BOEM released in its supplemental production content that had previously been redacted without "sufficient justification," Pl.'s Reply at 3–4, citing as an example that the "newly produced chain" reveals phrases such as "Will do," which text had been previously redacted, *id.* In the plaintiff's view, this example is "evidence [of] BOEM's over-designation of privilege," such that "BOEM has not met its burden to show these now unredacted documents were appropriately withheld. *Id.* The disclosures of previously redacted portions of the email chain resulted from an agency determination "that there is no potential harm in releasing" the new material. BOEM Suppl. Decl. ¶ 8. The plaintiff, in effect, seeks to use BOEM's decision to make additional disclosure of an email chain that might be withheld under the attorney-client privilege in its entirety, as a sword to require additional disclosure. Yet, assessment of the propriety of withholding turns on the sufficiency of the agency's explanation and, here, BOEM

27

BSEE withheld the bodies of "two different drafts of the [April 3, 2015] memorandum," which are together identified with Bate-stamp number GOMRBSEE000926-939.  BSEE Suppl. Decl. ¶ 15.  Both of the documents, which are dated April 3, 2015, "include comments and redline edits by BSEE officials and SOL attorneys."  *Id.*; BSSE Suppl. Decl. Ex. B–C. Although BSEE initially withheld the drafts in their entirety, the "To," "From," and "Subject" headings have now been released because BSEE "determined that there is no potential harm in releasing at this time."  *Id.*  The subject line, which is the title of the memorandum, reads: "Taylor Energy Company LLC, Mississippi Canyon Block 20- BSEE's Considerations for Revision of Taylor Energy's Trust Agreement."  *Id.*  BSEE had "sought legal counsel from DOJ in connection with Taylor's request for the return of trust fund money," related to the MC20 site, and the memorandum "was requested from BSEE by [DOJ] during [that] consultation."  BSEE Suppl. Decl. ¶¶ 16–20.  Drafted by Mr. Herbst, the memorandum "in its final form was approved by Director Salerno to inform discussions between BSEE and DOJ," and "Director Salerno's Office sent this memorandum to DOJ on April 3, 2015."  *Id.* ¶ 21.  The "final decision denying Taylor's departure" was issued over a month later, on May 11, 2015, and "[s]hortly thereafter, Taylor was informed that trust funds would not be returned at that time."  *Id.* ¶ 22.  The plaintiff then sued the United States in the Court of Federal Claims for breach of the trust agreement.  *Id.* ¶ 23.

---

has met its burden of showing that the disputed material was properly withheld under the attorney-client privilege because the email includes "agency attorneys" and "attorney client communication" regarding decisions about the plaintiff's obligations for an oil spill site and "in anticipation of litigation."  *Id.* ¶ 7.

BSEE's explanation of the two draft versions of the memorandum demonstrate that the bodies of these documents are properly withheld, at a minimum, under Exemption 5's deliberative process privilege because the material is both predecisional and deliberative. *See Access Reports*, 926 F.2d at 1194 ("[A]n agency asserting the privilege must show that the document is both 'predecisional' and 'deliberative.'). BSEE describes the withheld versions of the April 3, 2015 memorandum as in "draft" form, with "comments and redline edits" that do "not represent a final determination of BSEE, DOI, or DOJ." BSEE Suppl. Decl. ¶¶ 15, 24. Indeed, because BSEE explains that these April 3, 2015, drafts pre-date the final memorandum, as approved by Director Salerno, as well as BSEE's May 11, 2015 decision on the plaintiff's departure request, and the subsequent denial of the plaintiff's request to return its trust funds that preceded the ongoing litigation, *id*. ¶¶ 21–24, the agency's description of the withheld material confirms that such material is predecisional, *see Coastal States*, 617 F.2d at 866 (noting that a document is predecisional when "it was generated before the adoption of an agency policy."). BSEE also states the drafts are "deliberative" because they "express[] the BSEE's tentative views as to whether and why or why not a departure from BSEE regulations and return of the trust funds might be appropriate." BSEE Suppl. Decl. ¶ 24. Moreover, they represent "confidential inter-agency communication providing BSEE's opinions to DOJ attorneys who were anticipating litigation with Taylor on the issue of the trust fund," *id.* ¶ 24, which demonstrates that the drafts were part of a deliberative process, *see Coastal States*, 617 F.2d at 866 ("[The deliberative process privilege] covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."). These explanations are adequate to demonstrate the predecisional and deliberative

nature of the information underlying the deliberative process privilege and that these two draft

documents were properly withheld in part under Exemption 5.[15]

> #### d) Nearly Final Version of the April 3, 2015 Memorandum (GOMRBSEE000914-921)

BSEE withheld in part "a nearly final, but unsigned, version of the same memorandum

attached to a transmittal email from Charlyn Spies [of BSEE] to Lars Herbst," which is identified

with Bate-stamp number GOMRBSEE000914-921. BSEE Suppl. Decl. ¶ 15. BSEE explains

that this version of the April 3, 2015 memorandum is different from the two versions addressed

*supra* in Part III.B.2.c, and the bodies of all three versions are withheld for the same reasons.

*See id.* In the exhibits to the BSEE Supplemental Declaration, the unredacted headings in the

nearly final version of the memorandum, although also dated April 3, 2015, make the document

appear very similar to the two versions in GOMRBSEE000926-939, but the documents have

visible differences, including placement of the date and the label of "deliberative process

privilege." *Compare id.*, Ex. B, *with id.*, Ex. C. Nonetheless, BSEE explains regarding the

application of Exemption 5 to all three versions, the April 3, 2015 memorandum "does not

represent a final determination of BSEE, DOI, or DOJ; rather it was a confidential inter-agency

communication providing BSEE's opinions to DOJ attorneys who were anticipating litigation

with Taylor on the issue of the trust fund." *Id.* ¶ 24. This description is sufficient to meet the

---

[15] The plaintiff relies on a non-binding case from this Court to contest the application of the deliberative process privilege by claiming that the agencies have not "demonstrate[d] that harm will result if the redacted documents are released." Pl.'s Mem. at 9 (quoting *Hall v. DOJ*, 552 F. Supp. 2d 23, 29 (D.D.C. 2008)). The plaintiff, however, misreads the case and the law, which require an agency to "demonstrate that disclosure would harm the decisionmaking process." *Hall*, 552 F. Supp. 2d at 29; *see also Mead Data*, 566 F.2d at 258 (explaining agency must demonstrate "that disclosure would defeat, rather than further, the purposes of FOIA"). Here, the defendants have explained that the material in the body of the memorandum reflects tentative agency views regarding legal issues with the plaintiff, and the declarations make clear that releasing such material could affect deliberations in ongoing legal disputes. The plaintiff also argues, without support or citation, that the defendants need to provide additional evidence of why there is only now "no potential harm" in releasing the heading information in the three versions of the memorandum. *See* Pl.'s Reply at 6. Again, the plaintiff demands additional explanations that are not required by the law and thus fails to persuade the Court that the deliberative process privilege has been misapplied.

prerequisites for invocation of the deliberative process privilege and, consequently, the challenged third version of the memorandum was properly withheld under Exemption 5.

> e) *BSEE's April 3, 2015 Memorandum, Received by BOEM from SOL (BOEM000019-000025)*

BOEM withheld in part a version of the April 3, 2015 memorandum, identified by Bate-stamp number BOEM000019-000025, releasing only the heading information, including the date of April 3, 2015, the sender, and the recipient, as well as the subject line because BOEM FOIA determined there is "no potential harm in releasing it at this time." BOEM Suppl. Decl. ¶ 11. BOEM received the memorandum "from an attorney in [SOL], in order to inform BOEM's feedback on the draft 20-point document," which related to the plaintiff and its ongoing obligations at the MC20 site, and as such, "BOEM FOIA consulted with both BSEE and SOL to determine whether redaction of the document was appropriate." *Id.* ¶ 12. Based on a comparison of the released heading information, the version of the memorandum in BOEM000019-000025 appears to be the same version that BSEE included in GOMRBSEE000914-921. *Compare* BSEE Suppl. Decl., Ex. B, *with* BOEM Suppl. Decl., Ex. B. BOEM states that the body of the memorandum was withheld under the deliberative privilege process for the same reasons that BSEE withheld the body of the memorandum. *See* BOEM Suppl. Decl. ¶¶ 15–16 (explaining, with respect to Taylor's requests for departure and revision of its trust agreement and trust refund, "[a]t the time of this memorandum, final decisions regarding these issues had not been made, and BSEE was working with DOJ to determine what approach was appropriate or advisable"). For the same reasons that BSEE is found to have provided a sufficient explanation to demonstrate its withholdings of the body of the memorandum were proper under the deliberative process privilege, BOEM is found to have met the requirements for redacting the body of the memorandum under Exemption 5.

***

In sum, the defendants have sufficiently demonstrated that BOEM and BSEE properly invoked Exemption 5 to withhold information in the five disputed documents.

### C. Segregation of Non-Exempt Material

"The FOIA requires that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Morley*, 508 F.3d at 1123 (alteration in original) (citing 5 U.S.C. § 552(b)).  To satisfy its segregability obligation, an "agency must provide a 'detailed justification' for . . . non-segregability," but "is not required to provide so much detail that the exempt material would be effectively disclosed."  *Johnson v. Exec. Office for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citing *Mead Data*, 566 F.2d at 261).  An agency may provide sufficient justification by describing the materials withheld, the exemption under which they were withheld, and an affidavit attesting that "it released all segregable material."  *See Loving*, 550 F.3d at 41 (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination") (citing *Johnson*, 310 F.3d at 776).  Accordingly, the BOEM and BSEE met their segregability burdens by submitting attestations of their respective declarants that documents were reviewed "on a page by page, line-by-line basis" and no further segregation would be possible.  BOEM Suppl. Decl. ¶ 4; BSEE Dec. ¶ 29.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted, and the plaintiff's cross-motion for summary judgment is denied.

An Order consistent with this Memorandum Opinion will issue contemporaneously.

**DATE:** September 21, 2017

_____
BERYL A. HOWELL
Chief Judge